# In the United States Court of Federal Claims

BID PROTEST
No. 18-271C
(Filed Under Seal: May 16, 2018 | Reissued: June 4, 2018)[*]

|  |  |  |
|---|---|---|
| CR/ZWS LLC, | ) | Keywords: Bid Protest; Small Business |
| | ) | Administration; 8(a) Business |
| Plaintiff, | ) | Development Program; Joint Venture |
| | ) | Agreements. |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VMX INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*Megan C. Connor*, PilieroMazza PLLC, Washington, D.C., for Plaintiff. *Kathryn V. Flood*, *Patrick T. Rothwell*, and *Kathryn M. Kelley*, PilieroMazza PLLC, Washington, D.C., Of Counsel.

*Kristin B. McGrory*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant, with whom were *L. Misha Preheim*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General.

*Nicholas T. Solosky*, Fox Rothschild LLP, Washington, D.C., for Defendant-Intervenor.

---

[*] In its initial filing of this opinion and order, the Court gave the parties the opportunity to request redactions. The government did not propose any, but CR/ZWS LLC requested numerous redactions throughout the opinion. The Court concludes, however, that almost all of the portions of the opinion that CR/ZWS seeks to redact are not competition-sensitive or otherwise protectable, and that their redaction would make portions of the Court's opinion difficult to understand. Therefore, with the exception of one third-party individual's name, the Court rejects CR/ZWS's requests and reissues the opinion.

**OPINION AND ORDER**

**KAPLAN, Judge.**

This case involves a protest of the United States Army's award of a contract for refuse and recycling services. The procurement was open only to small businesses participating in the Small Business Administration's (SBA) 8(a) Business Development Program. Plaintiff CR/ZWS LLC is a joint venture composed of Charitar Realty (Charitar), a program participant, and Zero Waste Solutions, Inc. (ZWS), the incumbent contractor and a graduate from the 8(a) program.

Joint ventures that include an 8(a) participant, like CR/ZWS, must secure SBA approval of the arrangement between the joint venturers to be eligible for 8(a) procurements. Here, although CR/ZWS was declared the apparent awardee in the Army's procurement, the SBA ultimately refused to approve an amendment to the joint venture agreement that Charitar submitted in connection with the procurement. In particular, the SBA determined that the joint venture agreement, as amended, was not fair and equitable, and that Charitar brought little to the relationship other than its 8(a) status. As a result, the SBA concluded that the joint venture arrangement could not be approved under 13 C.F.R. § 124.513(a)(2). The Army therefore awarded the contract to Defendant-Intervenor VMX International, LLC (VMX), the next lowest bidder. CR/ZWS, in turn, filed this bid protest, challenging the SBA's adverse determination with respect to its proposed amendment, as well as the Army's award to VMX.

Currently before the Court are CR/ZWS's and the government's cross-motions for judgment on the administrative record. For the reasons set forth below, CR/ZWS's motion for judgment on the administrative record is **DENIED** and the government's cross-motion for judgment on the administrative record is **GRANTED**.

**BACKGROUND**

**I.     The Solicitation**

On July 11, 2017, the United States Army's Mission and Installation Contracting Command at Ft. Riley, Kansas issued an invitation for bids for a fixed price requirements contract to provide refuse and recycling services at Ft. Riley. Admin. R. (AR) Tab 30 at 167–71, 205. Specifically, the Army was seeking a contractor to "provide all personnel, equipment, tools, materials, vehicles, supervision, and other items and services necessary to perform refuse and recycling services." Id. at 170. The winning contractor would also operate the construction and demolition landfill at the fort. Id. at 171; id. Tab 14 at 103.

The acquisition was designed as a 100% set-aside for participants in the SBA's 8(a) Business Development Program,[1] with a size standard of $38,500,000.[2] Id. Tab 30 at 167. Interested parties were required to submit sealed bids to the Army prior to August 10, 2017. Id. at 207. The Army would open the sealed bids on August 10, and ultimately award the contract to the "lowest overall priced responsible bidder." Id.; see also id. at 210 ("The Contracting Officer shall make a contract award . . . to the responsible bidder whose bid . . . will be most advantageous to the Government, considering only price and the price-related factors included in the invitation."). The award would not be made, however, until the Army obtained "all required approvals" and the award was in conformance with FAR 14.103-2. Id. at 210.

The solicitation stated that in evaluating price and price-related factors, the contracting officer would determine whether the "prices offered [we]re fair and reasonable before awarding the contract." Id. at 211. The contracting officer was also required to consider whether bids were materially unbalanced in accordance with FAR 15.404-1, and could apply the price analysis techniques contained in that provision. Id. Finally, in accordance with the fact that the contract was set aside for 8(a)-eligible businesses, the solicitation provided that the successful bidder must be a participant in the SBA's 8(a) business development program. See id. at 197.

## II. The Joint Venture

### A. The Original Joint Venture Agreement

As noted, CR/ZWS LLC is a joint venture between Charitar and ZWS. Id. Tab 82 at 676. Charitar is a real estate, janitorial, and property maintenance firm certified by the SBA as an 8(a) business development participant. Id. at 678; see also id. Tab 100 at 804. ZWS is a "graduate" of the SBA's 8(a) business development program and is the incumbent contractor for refuse and recycling services at Ft. Riley. Id. Tab 83 at 680; id. Tab 100 at 804.

A joint venture that includes an 8(a) participant, like CR/ZWS, is eligible to pursue an 8(a) contract if the SBA approves its joint venture agreement for the performance of that contract.[3] 13 C.F.R. § 124.513(a)(1). On July 21, 2016, Charitar accordingly submitted its joint

---

[1] Section 8(a) of the Small Business Act authorizes the small business development program. See 13 C.F.R. § 124.1 (2017); see also 15 U.S.C. § 637(a) (Supp. IV 2016). "The purpose of the 8(a) [business development] program is to assist eligible small disadvantaged business concerns [in] compet[ing] in the American economy through business development." 13 C.F.R. § 124.1. Qualifying small business concerns are admitted to the program as participants for a term of up to nine years. Id. § 124.2. Upon successful completion, participants "graduate" from the 8(a) program. See id. § 124.302.

[2] "SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns." 13 C.F.R. § 121.101(a).

[3] Where a joint venture involving an 8(a) participant seeks to perform additional 8(a) contracts after the SBA has already approved its joint venture agreement for a specific contract, it must

venture agreement with ZWS to the SBA for approval in order to bid on a solicitation issued by the Department of Homeland Security. See AR Tab 82 at 676; see also id. Tab 82.1 at 679.1–679.17. The SBA approved the CR/ZWS joint venture agreement on September 14, 2016. Id. Tab 82.2 at 679.18; see also id. Tab 100 at 804. Since that time, the SBA has also approved four amendments to the agreement that CR/ZWS submitted "for the purpose of bidding on successive 8(a) BD contracts." Id. Tab 100 at 804.

### B.      Proposed Amendment 5 to the Joint Venture Agreement

On August 10, 2017, at approximately the same time that CR/ZWS submitted its bid for the procurement at issue in this case, it submitted Amendment 5 to its joint venture agreement to the SBA for approval. See id. Tab 87 at 703–08; see also id. Tab 90 at 721. Consistent with 13 C.F.R. § 124.513, the amendment specifically addressed the provision of services and the division of responsibilities in the event that the Army awarded the Ft. Riley contract to CR/ZWS. Id. Tab 87 at 703–08.

Amendment 5 contained a description of the equipment, facilities and other resources that would be furnished by each venturer, consistent with 13 C.F.R. § 124.513(c)(6). Specifically, it provided that Charitar would supply the joint venture with "office equipment[] such as desktops, laptops, printers, uniforms, labor, supplies and cell phones" at a total estimated value of $50,000. Id. at 703–04. It would also provide "local office space, supplies, uniforms, and [personal protective equipment]." Id. at 704. ZWS, on the other hand, would provide "service equipment[] and vehicles" with a total estimated value of $650,000. Id.

Additionally, pursuant to 13 C.F.R. § 124.513(c)(2), the proposed amendment specified that [***], who was then an employee of Shell Soft, Inc., would become an employee of Charitar and serve as the project manager for the potential Ft. Riley contract. Id.; see also 13 C.F.R. § 124.513(c)(2) (requiring that the joint venture agreement "[d]esignat[e] . . . an employee of [the] 8(a) Participant as the project manager responsible for performance of the contract"). Under § 124.513(c)(2), "[t]he individual identified as the project manager of the joint venture need not be an employee of the 8(a) Participant at the time the joint venture submits an offer, but, if he or she is not, there must be a signed letter of intent that the individual commits to be employed by the 8(a) Participant if the joint venture is the successful offeror." Charitar did not, however, include any letter of intent to employ [***] with its submission to the SBA, see AR Tab 87; see also id. Tab 90; but it has attached to its complaint a copy of such a letter (dated July 12, 2017), Compl. Ex. D, ECF No. 1.

The amendment also specified that Charitar would supply four other full-time-equivalent employees in addition to the project manager. AR Tab 87 at 708. These employees would serve as quality control manager, quality control inspector, scale operator, and landfill operator, and collectively with the project manager would perform 9,360 annual hours under the contract out

---

submit for the SBA's approval addenda to the joint venture agreement that address those additional contracts. 13 C.F.R. § 124.513(e)(2).

of a total of 13,520 annual hours. AR Tab 87 at 708. The remaining annual hours would be performed by two full-time equivalents, heavy truck drivers, employed by ZWS. Id.

With respect to staffing generally, the amendment provided that Charitar and ZWS would each hire new employees for performance of the contract, and would do so "in accordance with the requirement under Executive Order 13495 to provide a right of first refusal to the incumbent contract personnel."[4] Id. at 704. Further, in order to comply with SBA regulations, Charitar and ZWS agreed that Charitar "must perform at least forty percent (40%) of the work performed by the Joint Venture and its work must be more than administrative or ministerial functions so [that it] gains substantive experience." Id. at 705.

Finally, the amendment specified that Charitar would "provide overall executive oversight and [would] have overall responsibility for managing the . . . Contract." Id. It would also "perform major contract functions including workforce management, recycling services, contract administration, union negotiations[,] and monthly contract report[s]." Id. ZWS would "perform refuse collection and provide service equipment[]." Id.

## III.   The SBA Initially Verifies Charitar's Eligibility for the Award

The Army received three sealed bids in response to its invitation, including one from CR/ZWS and one from VMX. Id. Tab 37 at 261. It opened the sealed bids on August 10, 2017. See id. At that time, the Army noted that CR/ZWS was the apparent low bidder. Id.; see also id. Tab 38 at 262. VMX was second. Id. Tab 38 at 262.

Following the opening of the sealed bids, the Army's contracting officer emailed the SBA's Fresno District Office on August 11, 2017, to verify the "eligibility of a joint venture between Zero Waste Solutions and Charitar Realty . . . for the refuse contract for Fort Riley, KS." Id. Tab 42 at 396. That same day, the SBA's Fresno Office responded with a confirmation of the joint venture's eligibility for the contract award. Id. at 395; id. Tab 43 at 397.[5]

## IV.   VMX's Protests

Notwithstanding the SBA's eligibility determination, the contracting officer did not move forward immediately with a price analysis, determination of responsibility, or award of the

---

[4] Executive Order 13,495 requires a subsequent contractor who receives a follow-on contract for the same or similar services in the same location to provide a right of first refusal for employment for the non-managerial and non-supervisory employees of the previous contractor. Exec. Order No. 13,495, 74 Fed. Reg. 6,103 (Jan. 30, 2009).

[5] The notification was provided in what appears to be a standardized form that was executed and signed by an SBA Economic Development Specialist in the Fresno District Office. AR Tab 43 at 397. That specialist checked the box entitled "MEETS ELIGIBILITY," which stated that "[t]he firm named above [i.e., CR/ZWS] meets the 8(a) Program Eligibility requirements, [North American Industry Classification System (NAICS)] code size standard requirements, and is eligible for award." Id. It is unclear from the document to what extent the SBA considered Amendment 5 (submitted only the evening before) in making its eligibility determination.

contract to CR/ZWS. See id. Tab 64 at 569. Instead, the remaining steps were put on hold because of protests filed by unsuccessful bidder VMX. One was a size protest filed with the Army and referred to the SBA, and the others were two bid protests, one filed with the Army and another with the Government Accountability Office (GAO).

In its size protest, filed on August 17, 2017, VMX argued that CR/ZWS was not eligible for award under the SBA's 8(a) business development program because, among other reasons, ZWS allegedly exceeded the procurement's size standard. Id. Tab 45 at 401. The Army forwarded VMX's size protest to the SBA's Area Office of Government Contracting on August 21, 2017. Id. Tab 56 at 462 n.2. On September 5, 2017, however, the SBA advised the Army that it would not decide VMX's size protest until after the Army decided VMX's agency-level bid protest. Id. at 463–64.

In the meantime, on August 18, 2017, VMX submitted a bid protest to the Army, challenging the proposed award to CR/ZWS on the ground that CR/ZWS was "not responsible to perform the work." Id. Tab 55 at 444. On October 30, 2017, the Army denied this protest, finding it premature because the Army had not yet conducted any price or responsibility analysis and had not actually awarded the contract to CR/ZWS. Id. Tab 56 at 465.

Finally, on November 9, VMX filed a similar bid protest with GAO. Id. Tab 57 at 469. It alleged that CR/ZWS was not responsible or eligible for award because it had violated certain SBA regulations in submitting its bid; because its price was unbalanced, unreasonable, and unrealistic; and because it lacked the necessary corporate infrastructure for performance. Id. Tab 58 at 472–73.

On December 6, 2017, GAO "dismiss[ed] the protest as premature because it merely anticipate[d] improper action that ha[d] not yet taken place." Id. Tab 65 at 570. GAO relied upon the lack of any price or responsibility analysis and the ongoing SBA size protest to conclude that "there [was] no basis for [it] to consider VMX's protest." Id. at 571.

## V.   The SBA's Consideration and Rejection of Amendment 5

In the meantime, while the protests were pending, Charitar communicated with the SBA on several occasions in October and November 2017 regarding the status of its August 10, 2017 request for approval of Amendment 5. See id. Tab 91 at 731 (November 3, 2017 email from Charitar to SBA referencing October phone call with SBA concerning status of approval request); id. Tab 92 at 735 (email from Charitar to SBA seeking "update for the amendment #5"). On December 28, 2017, the SBA followed up, sending Charitar an email requesting a link to the relevant solicitation as well a copy of Charitar's most recent business plan "[t]o coincide with . . . JV Amendment[] 5." Id. Tab 93 at 740. The record does not include any response to the SBA's request by Charitar.

On January 17, 2018, the Acting District Director of SBA's Fresno District Office wrote to Charitar's president advising her that SBA was rejecting Amendment 5. Id. Tab 67 at 574–75. She stated that after performing "a thorough review of the information [Charitar] submitted for approval of Amendment #5," the SBA had concluded that the amendment "raise[d] questions of

control and technical requirements." Id. at 574. The letter cited several grounds for the SBA's decision.

First, the SBA observed that under the amendment, ZWS would "provide all the equipment needed to deliver the contract valued at $650,000," while Charitar would "provide all the equipment to administer the contract valued at $50,000." Id. According to the SBA, "this division of provided equipment" suggested that the 8(a) participant, Charitar, was not "investing equitable portions [in] the JV." Id.

Second, the SBA asserted that under the proposed amendment, the project manager on the contract would be an employee of ZWS. Id. This was problematic, according to the SBA, because the project manager had been given the authority to negotiate the contract. Id. Authority to negotiate the contract, it observed, "should be to the 8a venturer, with assistance from the partner venturer." Id.

Further, the SBA observed, although under the staffing plan Charitar would hire four full-time-equivalent employees, those roles were then being performed under ZWS's incumbent contract by ZWS employees, who would have a "first right of refusal" with respect to Charitar's hiring of any other employees for their positions. Id. "[T]his division of labor," the SBA opined, would not allow Charitar to gain experience in performing certain aspects of the contract. See id.

The SBA also questioned CR/ZWS's assertion that Charitar would perform 40% of the work. It noted that it appeared that Charitar had been "relegated to managerial duties." Id. "As it reads," according to the SBA, "the 8a venturer must gain substantive experience, but [the amendment] does not delineate what or how this will be done." Id. Further, according to the SBA, the amendment indicated that Charitar would be performing "executive oversight" of the contract, which the SBA believed "translates to administrative [work], without any actual performance experience in the delivery of services on the base." Id.

Finally, the SBA noted that "Charitar has no prime contracting experience in . . . solid waste collection services," while "ZWS – the incumbent – has all the experience, equipment and personnel needed to perform the government contract at issue." Id. at 575. Charitar's lack of experience in performing these services and its lack of the necessary vehicles, the SBA reasoned, would lead to it being "wholly dependent on ZWS for performance," raising "issues of negative control." Id. Citing 13 C.F.R. § 124.513(a)(2), the SBA concluded that because "Charitar brings very little to the joint venture relationship in terms of resources and experience other than its 8(a) status, SBA should not approve the joint venture agreement." Id.

In light of its rejection of Amendment 5, the SBA denied VMX's pending size protest on January 23, 2018. Id. Tab 53 at 440. It concluded that because CR/ZWS's proposed amendment "was being declined . . . CR/ZWS cannot be considered an eligible 8(a) concern for this instant procurement." Id. at 441. Because this "eliminated [CR/ZWS] from being considered for award," it was "no longer the prospective awardee" and VMX's protest was therefore "dismissed as premature." Id.

**VI.      The SBA Denies CR/ZWS's Request for Reconsideration**

On January 23, 2018, CR/ZWS requested that the SBA reconsider its decision rejecting Amendment 5. Id. Tab 96 at 744–46. On February 14, 2018, the SBA denied the request. Id. Tab 100 at 804–08.

In denying reconsideration, the SBA observed that under its regulations, "an 8(a) joint venture agreement is permissible only where an 8(a) Participant lacks the necessary capacity to perform the contract on its own, and the agreement will be fair and equitable and will be of substantial benefit to the 8(a) concern." Id. at 804–05 (citing 13 C.F.R. § 124.513(a)(2)). It noted that in its original decision, it had concluded that the agreement as modified by Amendment 5 "would not substantially benefit Charitar because the firm lacks the requisite resources and expertise to meaningfully contribute to contract performance, and would bring very little to the relationship other than its 8(a) status." Id. at 805. "Specifically," the SBA observed, "the decline letter noted concerns with respect to equipment disparity, project management and staffing, contract negotiation, and performance, and prior experience." Id.

The SBA then addressed and rejected each of CR/ZWS's proffered grounds for reconsideration. First, CR/ZWS had argued that in rejecting Amendment 5, the SBA had improperly relied upon the disparity between Charitar's and ZWS's proposed contributions of equipment needed to perform the contract. Id. Tab 96 at 744. CR/ZWS contended that there is no requirement in SBA's regulations that each venturer "invest an 'equitable' portion of equipment or resources." Id. Further, it argued that the SBA had "overlook[ed]" Charitar's other contributions to the joint venture "including office space, supplies, and uniforms, which make the agreement fair and equitable to both parties." Id.

The SBA dismissed CR/ZWS's argument that it had imposed an arbitrary requirement that the venturers' equipment contributions be equitable. Id. Tab 100 at 805. Rather, it noted, "[t]he decline letter clearly demonstrates that the [Fresno District Office] weighed the relative contributions of Charitar and ZWS and determined that Charitar would bring very little in terms of contract resources." Id.

CR/ZWS also requested reconsideration on the ground that—contrary to the SBA's belief—the proposed project manager was not an employee of ZWS; rather, he was an employee of a third party, Shell Soft. Id. Tab 96 at 745. Further, CR/ZWS claimed, the denial letter had disregarded the staffing plan that was included in Amendment 5, which specified that Charitar would employ the project manager, quality control manager, quality control inspector, scale operator, and landfill operator, while ZWS would employ only two full-time equivalents for purposes of contract performance, heavy truck drivers. Id.

The SBA conceded that it was mistaken when it stated that the proposed project manager was an employee of ZWS. Id. Tab 100 at 805. It nonetheless concluded that corrective action was not warranted because Charitar had still failed to comply with 13 C.F.R. § 124.513(c)(2) regarding the proposed project manager. See id. As noted, where an individual slated to be project manager is not an employee of the 8(a) concern at the time of submitting a bid, § 124.513(c)(2) states that "there must be a signed letter of intent that the individual commits to be employed by the 8(a) Participant if the joint venture is the successful offeror." But "[c]ontrary

to these regulatory requirements," the SBA stated, "it appears that CR/ZWS designated as project manager an individual not employed by Charitar without executing the . . . letter of intent." AR Tab 100 at 806.

Finally, CR/ZWS objected to the SBA's finding that "the 8a venturer will be doing the 'executive oversight' of the contract [which] translates to administrative, without any actual performance experience in the delivery of services on the base." Id. Tab 96 at 745 (quoting denial letter) (alteration in original). To the contrary, CR/ZWS argued, "Charitar will be gaining actual, hands-on experience through the five FTEs, which represent nearly 70% of the annual labor hours on this services contract." Id. (emphasis in original). It asserted that "[t]his work is more than administrative and offers Charitar the ability to gain experience in solid waste collection services—which is exactly the purpose of joint ventures under 13 C.F.R. § 124.513." Id.

The SBA rejected these contentions as well. Id. Tab 100 at 806. It asserted that "none of the FTEs under the contract would have come from Charitar," noting that, in accordance with the right of first refusal established under Executive Order 13,495, "CR/ZWS would primarily staff its share of FTEs . . . with personnel hired from ZWS." Id. As a result, the SBA believed "that Charitar would rely too heavily on ZWS's personnel, and . . . not obtain substantive staffing experience under the contract." Id. The SBA also concluded that under the amendment, Charitar "would have primarily provided administrative and ancillary services under the contract, while ZWS would have performed four of the five essential functions for the Army." Id. at 807. Specifically, "ZWS—or former employees of ZWS—would have been exclusively responsible for refuse collection, refuse delivery, recycling delivery and landfill operation." Id. Charitar, on the other hand, "would have only performed recycling collection and contract administration services, which amount to a small portion of contract deliverables under the [performance work statement]." Id. "It was thus reasonable," the SBA stated, "for the [Fresno District Office] to conclude that Charitar would have gained minimal substantive experience from th[e] contract." Id.

Finally, the SBA cited a recent size determination with respect to a contract for custodial services involving Charitar and ZWS. Id. at 808 (citing Charitar Realty, SBA No. SIZ-5806 (Jan. 25, 2017)). In that matter, the SBA had concluded "that Charitar ran afoul of the ostensible subcontractor rule," 13 C.F.R. § 121.103(h)(4), because: "1) ZWS was the incumbent on the predecessor contract for similar custodial services, and was ineligible to submit its own proposal; 2) Charitar would staff its portion of the contract almost entirely with personnel hired from ZWS; 3) Charitar's proposed project manager was an employee of ZWS; and 4) Charitar lacked the relevant experience to win and perform a contract for custodial services." Id. The SBA concluded that the similarity in circumstances "establishes a pattern of Charitar's undue reliance on ZWS," which "informs the inquiry of whether Charitar will substantially benefit from any subsequent contracts awarded to CR/ZWS." Id.

## VII.   Award to VMX

On January 19, 2018, the Army informed the SBA that—in light of the SBA's disapproval of the proposed amendment—the Army would reject CR/ZWS's bid. See id. Tab 69 at 577. That same day, the SBA found VMX eligible for 8(a) set-asides. Id. Tab 70 at 578.

Shortly afterward, on February 6, 2018, the Army awarded the Ft. Riley contract to VMX. Id. Tab 75 at 630–35. Also on February 6, the Army formally informed CR/ZWS that it had rejected its bid because of the SBA's "denial of [its] joint venture agreement." Id. Tab 81 at 675.[6]

## VIII.   This Action

On February 21, 2018, CR/ZWS filed its complaint here. Compl., ECF No. 1. In it, CR/ZWS alleges that the SBA "improperly denied an amendment to CR/ZWS's joint venture agreement in connection with an 8(a) Business Development Program . . . set-aside solicitation issued by the U.S. Department of the Army." Id. ¶ 1. "As a result," CR/ZWS asserts, "the Army improperly deemed CR/ZWS ineligible for award." Id.

In its three causes of action, CR/ZWS alleges that: 1) the SBA's denial was arbitrary, capricious, and an abuse of discretion; 2) the SBA's denial was contrary to law and regulation; and 3) the Army's use of the SBA's denial letter to reject its bid was arbitrary, capricious, an abuse of discretion, and in violation of law and regulation. Id. ¶¶ 20–39. CR/ZWS seeks declaratory relief and an injunction stopping VMX's performance of the contract, requiring the SBA to either approve or reevaluate CR/ZWS's proposed amendment, and directing the Army to award the Ft. Riley contract to CR/ZWS. Id. at 10–11.

VMX moved to intervene on February 22, 2018, and the Court granted its motion. ECF Nos. 9–10. On March 23, 2018, CR/ZWS filed a motion for judgment on the administrative record. ECF No. 22. The government then filed a cross-motion for judgment on the administrative record on April 6, 2018. ECF No. 27. VMX did not file any motions or briefs. The Court held oral argument on May 2, 2018. ECF No. 29.

## DISCUSSION

## I.   Subject Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

---

[6] VMX's performance was set to begin April 1, 2018, see AR Tab 77 at 643, but the Army agreed to a voluntary stay of performance for the duration of this protest, Status Conference at 11:01:51am (Feb. 23, 2018).

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359–62 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). In making the standing determination, the Court assumes well-pled allegations of error in the complaint to be true. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131–32 & n.9 (Fed. Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–95 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

Here, CR/ZWS is objecting to the Army's award of the contract to VMX, as well as to alleged regulatory violations by the SBA. SBA determinations regarding eligibility for set-aside contracts are decisions made in connection with a procurement. See Dorado Servs., Inc. v. United States, 128 Fed. Cl. 375, 383 (2016); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1356–60 (Fed. Cir. 2015). Further, CR/ZWS is an interested party because it was an actual bidder and it possesses a direct economic interest in that, as the lowest bidder in a lowest-price procurement, absent the SBA's allegedly erroneous eligibility determination, CR/ZWS would have had a substantial chance of being awarded the contract. Accordingly, the Court has jurisdiction over CR/ZWS's challenge to the SBA's decision.[7]

## II.   Bid Protest Standards

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under

---

[7] The government has argued that the Court lacks subject matter jurisdiction over one particular claim that CR/ZWS is pressing in its motion for judgment on the administrative record—that the SBA failed to comply with the procedural requirements applicable to informal adjudications under 5 U.S.C. § 555. For the reasons set forth in greater detail below, the Court rejects that argument.

RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007), aff'd, 285 F. App'x 746 (Fed. Cir. 2008). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

In a bid protest, the Court weighs challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that the agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1338.

## III.   The Cross-Motions for Judgment on the Administrative Record

In this case, the SBA determined that the amendment to the joint venture agreement between Charitar and ZWS was not "fair and equitable and . . . [not] of substantial benefit to the 8(a) concern"—i.e., Charitar. See 13 C.F.R. § 124.513(a)(2). It concluded that Charitar "[brought] very little to the joint venture relationship in terms of resources and expertise other than its 8(a) status." See AR Tab 95 at 743. As a result, the Army awarded the contract to the next lowest bidder, VMX.

CR/ZWS contends that, because the SBA originally certified CR/ZWS's eligibility to the Army in August 2017, it violated its own regulations by finding CR/ZWS ineligible for a contract award in January 2018. It also argues that the SBA violated CR/ZWS's "due process"

rights by not providing it with notice of the defects in Amendment 5 before it made its January 2018 determination of ineligibility.[8] Finally, it contends that the grounds for the SBA's decision are not adequately documented and that its determination that the joint venture arrangement did not satisfy regulatory criteria lacked a rational basis.

For the reasons set forth below, the Court finds each of these arguments unpersuasive.

### A.   Whether SBA Regulations Precluded the Agency from Revisiting its August 2017 Eligibility Determination

CR/ZWS first argues that the SBA violated one of its regulations—13 C.F.R. § 124.507(b)—when it rejected Amendment 5 in January 2018. Mem. in Supp. of Pl. CR/ZWS LLC's Mot. for J. on the Admin. R. (Pl.'s Mem.) at 9–12, ECF No. 23. According to CR/ZWS, under that regulation, the SBA was bound by the positive eligibility determination that it communicated to the Army on August 11, 2017, and lacked the authority to later reject Amendment 5. This argument lacks merit.

The regulation at issue states, in pertinent part, that "[i]n either a negotiated or sealed bid competitive 8(a) acquisition, the procuring activity will request that the SBA district office . . . determine that firm's eligibility for award." 13 C.F.R. § 124.507(b). Upon receipt of the request, the SBA is required to make its eligibility determination "[w]ithin 5 working days." Id. § 124.507(b)(1). Further, "[w]here the apparent successful offeror is a joint venture and SBA has not approved the joint venture prior to receiving notification of the apparent successful offeror," "[i]f SBA cannot approve the joint venture within 5 days" and "the procuring activity does not grant additional time for review," the regulation specifies that the SBA "will be unable to verify the eligibility of the joint venture for award." Id. § 124.507(b)(3).

According to CR/ZWS, 13 C.F.R. § 124.507(b) renders final and not subject to reconsideration any 8(a) eligibility determination that the SBA makes within five days after a contracting agency's request. Pl.'s Mem. at 9–12. Thus, according to CR/ZWS, because the SBA issued a positive eligibility determination within the five-day window, i.e., in August 2017, it was precluded from issuing a non-eligibility determination months later in January 2018.

CR/ZWS's reading of the regulation is unsupported by its text. Section 124.507(b) does not purport to make final and irrevocable any eligibility determination that SBA makes within the five-day window. Its apparent purpose is instead to promote efficiencies in the procurement process by imposing a short turnaround time on the SBA to make its 8(a) eligibility determinations, while giving agencies the authority to consent to a longer period for decision at

---

[8] CR/ZWS appears to have formulated these regulatory and procedural arguments after its review of the administrative record and they are not contained in its complaint. Nevertheless, the parties have fully briefed these issues in their cross-motions for judgment on the administrative record and the Court therefore treats the allegations as if raised in the pleadings. RCFC 15(b)(2); see also Elmore v. Corcoran, 913 F.2d 170, 172 (4th Cir. 1990); Pac. Gas & Elec. Co. v. United States, 70 Fed. Cl. 758, 763 n.6, 765 (2006); Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 523–24 (2006).

their discretion. The regulation also provides that if the SBA does not meet the five-day deadline, then—absent an agency's agreement to extend the deadline—it will not be able to verify the joint venture's eligibility for award at all. 13 C.F.R. § 124.507(b)(3). The effect of subsection (b)(3) is to give agencies the opportunity to move on to the next lowest bidder after five days if they have not yet heard from the SBA. Or, if they wish, they may give the SBA additional time.

Nothing in the text of the regulation precludes the SBA from revisiting or changing a prior, timely determination of eligibility, and doing so makes practical sense where, as here, a contract award has not yet been made. Indeed, the interpretation promoted by CR/ZWS would lead to the absurd result that the SBA could never correct a prior eligibility determination even if it was clear that the determination was erroneous or contrary to law. That result would not only undermine compliance with SBA requirements; it would also result in delays in the procurement process as competitors would be required to file protests in order to secure relief from erroneous SBA determinations.[9]

In short, SBA did not violate 13 C.F.R. § 124.507(b) when it made its January 2018 eligibility determination. Therefore, the government is entitled to judgment on the administrative record as to this claim.

## B.    CR/ZWS's Claim Under 5 U.S.C. § 555

CR/ZWS next argues that even if the SBA was not precluded by its regulations from revisiting its August 2017 eligibility determination, its "sua sponte reconsider[ation] . . . without providing CR/ZWS notice of the alleged defects in Amendment 5 or an opportunity to respond" violated CR/ZWS's procedural rights under 5 U.S.C. § 555, the provision of the Administrative Procedure Act (APA) that governs informal agency adjudication. Pl.'s Mem. at 12.[10]

As an initial matter, the Court is unpersuaded by the government's argument that it lacks jurisdiction over this claim. See Def.'s Cross-Mot. for J. on the Admin. R. & Opp'n to Pl.'s Mot. for J. on the Admin. R. at 16–17, ECF No. 27. It is, of course, well settled that the Court of Federal Claims lacks the authority to entertain claims predicated on the APA. See Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (per curiam); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005); Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (en banc); Century Expl. New Orleans, LLC v. United States, 110

---

[9] The Court also notes that the SBA's Office of Hearings and Appeals has similarly rejected an equitable estoppel challenge to an SBA reversal of a joint venture eligibility determination like the one that occurred here. Doyon Props., Inc., SBA No. SIZ-4838 (Feb. 12, 2007). Although not binding on the Court of Federal Claims, decisions of the SBA's Office of Hearings and Appeals may be persuasive. See Rotech Healthcare Inc. v. United States, 71 Fed. Cl. 393, 414, 421–23, appeal dismissed, No. 06-5121 (Fed. Cir. Nov. 28, 2006).

[10] In their briefs, the parties have generally referred to CR/ZWS's procedural rights claims as "due process" claims. But as CR/ZWS acknowledges, its claims are based on § 555, not the Fifth Amendment. CR/ZWS LLC's Reply in Supp. of Its Mot. for J. on the Admin. R. & Opp'n to Gov't's Cross-Mot. for J. on the Admin. R. at 15, ECF No. 28.

Fed. Cl. 148, 173 (2013), aff'd, 745 F.3d 1168, 1179–80 (Fed. Cir. 2014). But the Court's jurisdiction over CR/ZWS's claim is predicated not on the APA itself, but on the Tucker Act, which (as noted) grants the Court jurisdiction over "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Further, there is no question that an agency must "run [a] procurement" in conformance with the APA, which establishes the bedrock regulatory scheme that governs all agency conduct. See Cleveland Assets, LLC v. United States, 883 F.3d 1378, 1381–82 (Fed. Cir. 2018) (observing that the Tucker Act grants jurisdiction over "statutory and regulatory violations" that occur in "the procurement context," but not over those that are only "tangentially related to a government procurement"). And the parties agree that the SBA's denial constituted an informal adjudication for purposes of the APA. Thus, because CR/ZWS alleges that the SBA violated § 555 in the course of evaluating its eligibility to participate in the procurement, and because therefore this alleged violation occurred "in connection with a procurement," the Court has Tucker Act jurisdiction over its claim.

The Court concludes, however, that this claim clearly lacks merit because there is nothing in § 555 that guaranteed CR/ZWS notice and an opportunity to respond before the SBA reversed its initial determination regarding CR/ZWS's eligibility for the award. As the Supreme Court has explained, the requirements that agencies must follow when conducting an informal adjudication under § 555 are "minimal." Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 655 (1990). Indeed, in Pension Benefit Guaranty, the Supreme Court expressly rejected the argument that in an informal adjudication a "party is entitled . . . to know the issues on which decision will turn" in advance and "be apprised of the factual material on which the agency [will] rel[y] for decision so that he may rebut it" before the decision is made. Id. (quoting Bowman Transp., Inc., 419 U.S. at 288 n.4). Those procedural rights must be provided only in the context of formal agency adjudications under 5 U.S.C. §§ 554 and 556–57.

Section 555(b), by contrast, "is universally understood to establish" a less elaborate right—i.e., "the right of an interested person to participate in an on-going agency proceeding." Block v. S.E.C., 50 F.3d 1078, 1085 (D.C. Cir. 1995); see also 5 U.S.C. § 555(b) (providing in pertinent part that "[a] party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding" and that "[s]o far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function"). And even that limited right is subject to the "broad discretion" of agencies "to limit the participation of interested individuals and organizations in agency proceedings." Animal Legal Def. Fund, Inc. v. Vilsack, 237 F. Supp. 3d 15, 22 (D.D.C. 2017).

Similarly, subsection (e) provides significantly fewer procedural rights than those claimed here. It requires that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding" and that "[e]xcept in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial."

It cannot be disputed that the proceedings before the SBA in connection with this procurement were in compliance with these bare procedural requirements; in fact, they went

beyond them. Thus, CR/ZWS exercised its rights under 5 U.S.C. § 555(b) to participate in proceedings before the SBA when Charitar submitted Amendment 5 for the agency's approval on August 10, 2017. AR Tab 90 at 721. Further, CR/ZWS's participation was meaningful because it had notice of the standards that the SBA would apply in making its determination. Moreover, CR/ZWS received a written explanation of the grounds for the SBA's January 2018 decision, which facilitates the Court's review of that decision. In fact, it even had the opportunity to request that the agency reconsider the findings that CR/ZWS considered erroneous. In response, it received a second, more detailed explanation of the basis for the SBA's determination, which further facilitates this Court's review. See Olivares v. T.S.A., 819 F.3d 454, 463 (D.C. Cir.) (the requirement that an agency set forth its reasoning in writing "not only ensures the agency's careful consideration of [the request before it], but also gives parties the opportunity to apprise the agency of any errors it may have made and, if the agency persists in its decision, facilitates judicial review" (quoting Tourus Records, Inc. v. D.E.A., 259 F.3d 731, 737 (D.C. Cir. 2001))), cert. denied, 137 S. Ct. 282 (2016).

The Court rejects CR/ZWS's argument that some further procedural protections were warranted in light of the fact that the SBA advised the Army that CR/ZWS was eligible for the contract award on August 11, 2017. CR/ZWS was never informed of that initial determination and therefore took no actions in reliance on it (nor did it refrain from taking actions in reliance on that determination). See AR Tab 42 at 395 (August 11, 2017 SBA email sent only to Army); Pl.'s Mem. at 13 (stating that the SBA "did not notify CR/ZWS of the initial eligibility determination in August 2017"). In fact, CR/ZWS continued to anticipate and inquire about a decision on its proposed amendment well after August 2017. See AR Tab 91 at 731 (November 3, 2017 email from Charitar to the SBA inquiring as to the status of its review of Amendment 5); id. Tab 92 at 735 (November 6, 2017 email seeking same). Moreover, the SBA notified CR/ZWS in December 2017 that it had not yet made a determination regarding Amendment 5 and it gave CR/ZWS the opportunity to submit additional information for the review. See id. Tab 93 at 740 (December 28, 2017 SBA email to Charitar asking for solicitation and business plan for Amendment 5); id. Tab 94 at 741 (January 2, 2018 SBA email to Charitar seeking same). In short, CR/ZWS received all the procedural rights to which it was entitled under 5 U.S.C. § 555.

### C.      The SBA's Decision to Reject CR/ZWS's Joint Venture Amendment

Finally, CR/ZWS challenges the substance of the SBA's decision rejecting Amendment 5 as arbitrary, capricious, and contrary to law. First, it contends that the administrative record does not contain a sufficient explanation of the basis for what CR/ZWS characterizes as an "about-face" in the SBA's position between its initial eligibility determination in August 2017 and its subsequent non-eligibility decision in January 2018. Second, it claims that the SBA erred: 1) when it took into consideration the disparity in the relevant contributions of equipment and resources of each joint venturer; 2) when it concluded that the venturers' proposed project manager was a ZWS employee; 3) when it relied upon the fact that all other personnel on the contract would likely be former ZWS employees in light of the right of first refusal granted by Executive Order 13,495; 4) when it found that Charitar would be performing executive oversight of the contract only, without gaining experience in the delivery of services called for under the contract; and 5) when it concluded that Charitar would bring little to the joint venture other than its 8(a) status.

For the reasons set forth below, the Court concludes that the SBA acted well within its considerable discretion and consistently with its regulations when it rejected Amendment 5 and found that CR/ZWS did not establish its eligibility for the contract. The government is therefore entitled to judgment on the administrative record as to this claim.

First, the Court rejects CR/ZWS's argument that the record is inadequate because it does not explain why the SBA performed what CR/ZWS characterizes as an "about-face" in its position. What CR/ZWS identifies as a determination of its eligibility is reflected only in a box checked off on a form, dated August 11, 2017. The form itself makes no reference to Amendment 5 at all and, in fact, the SBA communicated CR/ZWS's eligibility via this form only a few working hours after CR/ZWS submitted Amendment 5 for its approval.

The Court concludes that the most reasonable reading of the record is that when the SBA made its eligibility determination the day after CR/ZWS submitted Amendment 5 for its approval, the SBA had not taken Amendment 5 into consideration. The record also strongly suggests that the SBA did not turn its attention to Amendment 5 until December 2017, when it requested additional information from CR/ZWS in connection with its review of that amendment.

In any case, the Court finds unpersuasive CR/ZWS's argument that the SBA failed to sufficiently articulate the basis for its rejection of Amendment 5. The agency's burden of explanation is a modest one; as noted, it need only articulate a "rational connection between the facts found and the choice made," and the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quotations omitted).

In this case, the basis for the SBA's determination regarding Amendment 5 is readily discerned from the January 2018 decision letter and the February 14, 2018 letter denying CR/ZWS's request for reconsideration.[11] Those letters reveal that in determining what Charitar was bringing to the joint venture arrangement (other than its 8(a) status), the SBA found it significant that virtually all of the equipment needed to perform the work (whose estimated value was $650,000) was to be supplied by ZWS, while Charitar would be supplying only local office space, office supplies, uniforms, and personal protective equipment, valued at $50,000. It also found that, in light of the requirements of Executive Order 13,495, Charitar would not be supplying any new non-managerial employees for the contract. Instead, the staff Charitar would

---

[11] The Court rejects CR/ZWS's argument that the SBA's February 14, 2018 letter contains "post-hoc rationalizations" that the Court should not consider. Pl.'s Mem. at 28. The February 14, 2018 letter was not an after-the-fact justification "advanced by an agency seeking to defend past agency action against attack." See Auer v. Robbins, 519 U.S. 452, 462 (1997). To the contrary, the February 14, 2018 letter is a part of the administrative decision-making process that CR/ZWS challenges here. It represents the agency's contemporaneous documentation of its rationale for denying CR/ZWS's request for reconsideration, which CR/ZWS made prior to litigation. AR Tab 100 at 804 ("This is in response to your letter . . . requesting that the U.S. Small Business Administration . . . reconsider its January 17, 2018, decision to decline the fifth amendment . . . to CR/ZWS[']s . . . joint venture agreement."); see also id. Tab 96 at 744–46.

employ, consisting of the quality control manager, the quality control inspector, the scale operator, and the landfill operator, would be hired "en masse" from ZWS. AR Tab 100 at 806. In addition, the SBA concluded that—notwithstanding the representation that Charitar would be performing 40% of the work on the contract—it appeared that Charitar's role would be largely confined to administrative tasks and executive oversight of the contract. Accordingly, the SBA found, Charitar would not gain any "actual performance experience in the delivery of services on the base." AR Tab 67 at 574. Further, the SBA observed that Charitar had no prime contracting experience in solid waste collection services while ZWS, the incumbent, "ha[d] all the experience, equipment and personnel needed to perform the government contract at issue." Id. at 575.

In short, the SBA concluded that:

> [I]f Charitar does not possess some experience in refuse services and the applicable NAICS code [for solid waste collection services], and if Charitar lacks essential vehicles that cannot be obtained from an outside source based on restrictions in the Solicitation's Performance Work Statement except from ZWS, and Charitar is wholly dependent on ZWS for performance of a contract due to its lack of experience and/or resources, then we have issues of negative control.

Id. And, "[i]f Charitar brings very little to the joint venture relationship in terms of resources and experience other than its 8(a) status," the SBA observed, it "should not approve the joint venture agreement." Id. (citing 13 C.F.R. § 124.513(a)(2)). These conclusions, in conjunction with the findings described above, supply the requisite "rational connection between the facts found and the choice made."

Further, the Court concludes that CR/ZWS has not identified any legal errors in SBA's determination. First, CR/ZWS is incorrect that the SBA imposed a requirement that Charitar invest an equal amount of resources and equipment in the joint venture. Rather, as noted above, the SBA considered the significant disparity between each venturer's contribution of equipment as one factor supporting its conclusion under 13 C.F.R. § 124.513(a)(2) that "Charitar would bring very little in terms of contract resources" and that the amendment, therefore, would not be fair and equitable. Id. Tab 100 at 805. In addition, as a result of the requirements of Executive Order 13,495, all employees on the contract (other than the project manager) would likely either be current or former ZWS employees, rather than employees brought on independently by Charitar.[12]

---

[12] CR/ZWS contends that taking the right of first refusal under Executive Order 13,495 into consideration makes it difficult for an 8(a) participant to form a joint venture with an incumbent contractor. Pl.'s Mem. at 25. But the SBA's non-eligibility finding was not based solely on the fact that the contract would be primarily staffed by current or former ZWS employees; the SBA also looked at the fact that ZWS was supplying the lion's share of the equipment and that Charitar brought little else in terms of resources and expertise to the contract.

In short, the equipment, expertise, and experience necessary for performance of the contract would be supplied almost exclusively by ZWS, not Charitar. And even leaving aside the requirements of the Executive Order, it is not surprising that the SBA concluded that Charitar would bring little to the joint venture in terms of expertise and experience. Charitar, after all, is a real estate, janitorial, and property maintenance firm; it does not perform services under the NAICS code applicable to the procurement for refuse and recycling services. Compare id. Tab 30 at 167 with id. Tab 82 at 678.

The record similarly supports the SBA's skepticism regarding whether Charitar would actually perform 40% of the non-administrative and non-ministerial tasks under the contract, as well as its conclusion that Charitar would not gain sufficient substantive experience to justify approving the joint venture arrangement. While the proposed amendment represents that Charitar "will perform forty percent (40%) of the work," section 3.4.2 specifies that the work Charitar would perform would involve "overall executive oversight," including tasks such as "workforce management, recycling services, contract administration, union negotiations[,] and monthly contract report[s]." Id. Tab 87 at 705. Meanwhile, as the SBA observed, the terms of Amendment 5 and of the procurement's performance work statement indicated that "ZWS—or former employees of ZWS—would have been exclusively responsible for refuse collection, refuse delivery, recycling delivery, and landfill operation," which were "four of the five essential functions for the Army." Id. Tab 100 at 807.

Finally, the Court notes that CR/ZWS has challenged the SBA's conclusion that Charitar's designation of [***] as its project manager was defective under 13 C.F.R. § 124.513(c)(2) because Charitar failed to submit a signed commitment letter executed by [***]. Under that provision:

> [T]he individual identified as the project manager of the joint venture need not be an employee of the 8(a) Participant at the time the joint venture submits an offer, but, if he or she is not, there must be a signed letter of intent that the individual commits to be employed by the 8(a) Participant if the joint venture is the successful offeror.

Id.

It is not entirely clear to the Court that this regulatory language supports the SBA's conclusion that [***]'s designation was defective. On the one hand, the Court notes that the aforementioned regulatory language does not express any requirement that a letter of intent be incorporated into a joint venture agreement or submitted to the SBA. It states merely that "there must be a signed letter of intent," which means, literally, that such a letter must exist. This passive language stands in contrast to the other language of the regulation, which imposes affirmative requirements regarding what statements, designations, specifications, and itemizations must be included in the provisions of the joint venture agreement. See, e.g., id. § 124.513(c) ("Every joint venture agreement . . . must contain a provision . . . setting forth the purpose of the joint venture . . . ."). Moreover, Charitar notes (and the government does not deny) that the SBA approved two earlier amendments to the joint venture agreement where the proposed project manager was not a current Charitar employee, notwithstanding that Charitar did

not submit a letter of intent to the SBA. See AR Tab 85 at 692; id. Tab 86 at 698; Pl.'s Mem. at 23–24 & n.3.

On the other hand, the requirement that there "must be a signed letter" is found within subsection (c) of the regulation, which is entitled "[c]ontents of joint venture agreement[s]." 13 C.F.R. § 124.513(c). Moreover, it is difficult to see how the SBA could effectively review the joint venture's compliance with this requirement if the joint venture was not required to include such a letter when it submitted its joint venture agreement for review. Such an interpretation might impose a needless additional step onto what is already a constrained timeframe, by requiring the SBA to inquire of joint ventures whether they possessed such letters.

But even if the Court was to conclude that the SBA erred when it found the designation of [***] defective, CR/ZWS was not significantly prejudiced by such an error, as is required to prevail in a bid protest. See Bannum, Inc., 404 F.3d at 1353 (citing Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); and Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). To establish "significant prejudice," CR/ZWS must show that there was a "substantial chance" it would have received the contract award but for the supposed error regarding the letter of intent. See id. In light of the other grounds articulated by the SBA for rejecting Amendment 5 (and found to be rational by the Court), the Court concludes that CR/ZWS has failed to make such a showing.[13]

In the end, what is ultimately at issue here is whether the amendment to the joint venture agreement between Charitar and ZWS promotes the underlying purposes of the Business Development Program as reflected in 13 C.F.R. § 124.513. That regulation authorizes an 8(a) concern that would otherwise lack the capacity to perform a contract to partner with a more experienced, non-8(a) concern through a "fair and equitable" joint venture agreement, and authorizes an agency to award the contract to the joint venture. But in order for the joint venture to be eligible for a contract set aside for 8(a) concerns, the joint venture arrangement must provide a "substantial benefit" to the 8(a) concern—i.e., it must enhance the 8(a) concern's future capacity to win and perform similar contracts on its own. At the same time, to ensure that the 8(a) concern will provide more than window dressing, which would allow the non-8(a)

---

[13] CR/ZWS also raises a concern about the SBA's citation of its recent decision in Charitar Realty, SBA No. SIZ-5806 (Jan. 25, 2017) as a basis for denying reconsideration. Pl.'s Mem. at 29. In that decision, the SBA concluded (as discussed above) that the arrangement between Charitar and ZWS in connection with a custodial, landscaping, and grounds maintenance contract ran afoul of the ostensible subcontractor rule because Charitar, the prime contractor, was unduly reliant upon ZWS, its subcontractor. CR/ZWS contends that the SBA's citation of this decision demonstrates that the SBA improperly incorporated "ostensible subcontractor" principles into the joint venture arena. Id. The Court disagrees. The SBA did not find CR/ZWS ineligible because of an application of the "ostensible subcontractor" rule; instead it cited its findings of "undue reliance" in Charitar Realty as informing its inquiry here as to whether Charitar would reap any benefit if the contract was awarded to CR/ZWS, as required by 13 C.F.R. § 124.513(a)(2).

concern to qualify for a contract award that it would not otherwise be eligible to receive, the SBA requires the 8(a) concern to bring more to the table than its 8(a) status.

Ultimately, the determination of how the balance should be struck upon consideration of the relevant factors is one entrusted to the SBA, not this Court. The government, accordingly, is entitled to judgment on the administrative record as to CR/ZWS's claim that the SBA's determination of non-eligibility was arbitrary, capricious, and inconsistent with law.

### CONCLUSION

For the foregoing reasons, CR/ZWS's motion for judgment on the administrative record is **DENIED** and the government's cross-motion for judgment on the administrative record is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge